## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| CONFIE SEGUROS HOLDING II CO., a Delaware corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>J.C. FLOWERS & CO. LLC, a Delaware limited liability company; J.C. FLOWERS I LP, a Delaware limited partnership; JAMES CHRISTOPHER FLOWERS, an individual; ERIC RAHE, an individual; and THOMAS C. DAVIS, an individual,<br><br>       Defendants. | Case No. 17-cv-05166<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Confie Seguros Holding II Co. (referred to as "Confie" or "Plaintiff"), by the undersigned counsel, alleges as follows against Defendants JC Flowers & Co. LLC ("JCF"), J.C. Flowers I LP ("JCF I"), and James Christopher Flowers ("Flowers") (collectively referred to as the "JCF Parties"); and Eric Rahe ("Rahe") and Thomas C. Davis ("Davis") (collectively the "Director Defendants") (together, all collectively referred to as "Defendants").

## INTRODUCTION

1.      This is a federal securities fraud case, also asserting a state law cause of action, against the defendant directors, and private equity sponsor of, Affirmative Insurance Holdings, Inc. ("AIH," also sometimes referred to as "Holdings"), who defrauded Confie into the nearly $100 million purchase of a network of managing general agencies (the "MGA

Businesses"), knowing and concealing their knowledge that events would transpire to significantly depreciate the value of the MGA Businesses. The MGA Businesses relied upon Affirmative Insurance Company ("AIC," which remained under AIH ownership) as their exclusive market for non-standard auto insurance policies, which are by their nature perceived as risky and unattractive to insurers who do not specialize in such policies. AIH and Confie entered the transaction knowing that AIC needed a cash infusion in order to meet an Illinois Department of Insurance ("IDOI") financial health metric, or else IDOI would place AIC into receivership. Defendants represented, as a closing condition, that a $20 million payment would be sufficient to meet IDOI's financial health metric, but in fact knew (and concealed) that this was untrue, and that IDOI receivership would be inevitable by the time the deal closed. Knowing that state receivership would jeopardize the transaction, Defendants participated in a race against time, wherein they endeavored to stave off and conceal IDOI's looming intervention just long enough for them to close the deal, pay their private equity sponsor with Confie's purchase money, empty AIH, and leave Confie holding the bag. After AIC went into receivership (as Defendants knew it would), Confie was forced to spend tens of millions of dollars in an eleventh hour attempt to place inherently risky and unattractive nonstandard auto policies with other insurers, in order to avoid lapses in coverage for the policyholders.

2. This action sounds in violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b–5 as promulgated thereunder by the SEC, 17 C.F.R. § 240.10b–5, and common law fraud.

3. In or around June of 2015, Confie entered into a Stock and Asset Purchase Agreement (the "SAPA," attached as Exhibit A) to acquire the MGA Businesses from AIH,

in a purchase referred to as the "MGA Deal." The MGA Businesses marketed non-standard private passenger automobile insurance policies ("non-standard auto policies") written by AIC. By their nature, non-standard auto policies are high risk, as the policyholders are drivers who, due to their risk profile, unable to obtain insurance through standard markets. Although Confie never intended to, and never did, acquire a direct interest in AIC (which was owned by AIH), AIC's health and continued operation as an insurance company was critical to the MGA Deal, because the MGA Businesses relied upon AIC as the exclusive market for their policies. AIH is controlled by Defendant Flowers, and at the time of the MGA Deal, Flowers was also a significant holder of AIH debt.

4.     The financial health of both AIH and AIC were material and central elements of the MGA Deal. Confie had concerns from the beginning of the transaction that AIC was either currently failing (or would shortly fail) to reach certain financial health metrics monitored by state insurance regulators. In particular, Confie was concerned that AIC's Risk Based Capital Ratio ("RBC Ratio") was too low, and could trigger regulatory intervention if it remained below 200%, which could ultimately lead to the state-forced liquidation of AIC.

5.     Confie knew that some sort of cash infusion to AIC would be necessary to increase the RBC Ratio above 200%, and to this end, the parties agreed that AIH would contribute a portion of Confie's purchase money to AIC. However, because Confie was not purchasing AIC, it did not have access to the financial data necessary to determine the size of the cash infusion needed. The parties anticipated that the cash infusion would be approximately $20 million, but agreed in the SAPA that the infusion would be in the amount required to raise the RBC Ratio above 200%. To this end, Confie required as a closing condition a certification from AIH's Chief Financial Officer that, after a $20 million cash

infusion, AIC's RBC Ratio would be above 200%. This was central to the MGA Deal, because the MGA Businesses derived much of their value from their ability to market policies to AIC.

6. At closing, on or around June 30, 2015, AIH's Chief Financial Officer ("CFO"), provided his signed certification stating that a $20 million contribution would bring AIC's RBC Ratio above 200% (the "RBC Certification," attached hereto as Exhibit B). The CFO, Director Defendants, and other officers and directors of AIH (collectively, "AIH Directors and Officers") knew at the time that the RBC Certification was false. AIH also specifically represented at closing that regulatory intervention was not pending or threatened, which the Defendants also knew was false.

7. After the MGA Deal closed, Confie learned what the Defendants and AIH Directors and Officers already knew—that the RBC Certification was false, and that the $20 million cash infusion was insufficient to push AIC's RBC Ratio above 200%.

8. While this was a shock to Confie, it was apparently no surprise to IDOI, because nearly immediately after the MGA Deal closed, the Director of the IDOI ordered a reserve analysis of AIC.

9. Events developed fairly rapidly, and worsened significantly, following the closing of the MGA deal: in September of 2015, IDOI sought and received a court order placing AIC into receivership; in October of 2015, AIH filed for Chapter 11 bankruptcy in Delaware; and in March of 2016 IDOI sought and received an Order of Liquidation upon AIC.

10. The receivership and subsequent liquidation of AIC has rendered the MGA Deal a disaster for Confie, while facilitating an ill-gotten windfall for certain Defendants,

namely Flowers. In order to do business without AIC as a market, Confie was forced to market the MGA Businesses' highly risky non-standard auto policies to other insurers at the last minute, in order to avoid lapses of coverage for the policyholders. Because Confie was forced to place these polices on an emergency basis, it had little leverage in negotiations, and policies were placed at extreme expense. All of this would have been unnecessary had AIC continued normal operations as Defendants had represented it would.

11. The one party who benefitted from the MGA Deal was Flowers, who was never intended to be a party to the deal, but conveniently ended up with Confie's purchase money despite AIH and AIC's respective implosions. Via various entities related to his private equity firm (described hereinafter), Flowers ultimately acted both as the controlling shareholder of AIH, and the holder of a significant amount of AIH's debts. Instead of using Confie's purchase money to bolster AIC's financial health, Flowers insisted to the AIH Board of Directors (which he substantially controlled) that AIH pay down the debt owed to him and his affiliates.

12. Through his influence over the AIH Board of Directors, Flowers was able to ensure that he and his affiliates took Confie's purchase money to enrich themselves at the expense of AIH and AIC, where without the MGA Deal, Flowers' investment in AIH would likely have been a total loss. Indeed, stunningly, Defendants at various times noted that AIH's most valuable attribute was the tax deductions available due to its net operating losses ("NOLs"). Until Confie appeared as a potential mark, Flowers viewed AIH as more valuable in bankruptcy than in operation.

13. The circumstances make clear that Flowers, the AIH Board of Directors (over which Flowers exercised great control), and the AIH Directors and Officers conspired to sell

Confie a business that was entirely reliant upon AIC as a market, while concealing the fact that AIC's death warrant already had been signed before the closing of the MGA Deal. The AIH Directors and Officers, including, but not limited to the AIH CFO, knew that the $20 million cash infusion would not and did not raise AIC's RBC Ratio above 200%, and the AIH Directors and Officers were aware that IDOI (and others, such as Wisconsin Department of Insurance (the "WDOI")) was monitoring the situation with great interest, and had already issued a Corrective Order as a result. The Defendants knowingly and intentionally concealed these facts from Confie with the objective of inducing Confie to close the MGA Deal, and ensuring Flowers recovered a substantial monetary windfall from his interest in, and loans to, AIH, which Flowers had previously considered to be a failed investment.

**JURISDICTION AND VENUE**

14.    The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b–5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b–5, as well as under the common law.

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.    This Court has jurisdiction over the Defendants named herein because Defendants have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

17.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as all significant activities occurred within this District, and

AIC was an Illinois insurance company with its principal place of business located in this District.

18.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to interstate telephone and email communications.

## PARTIES

19.     Plaintiff Confie Seguros Holding II Co. is a Delaware corporation that purchased the assets of several MGA Businesses in the MGA Deal, which was effected by the Stock and Asset Purchase Agreement dated June 12, 2015, and closed on June 30, 2015.

20.     Defendant J.C. Flowers & Co. LLC, a Delaware limited liability company, is a multi-billion-dollar private equity investment firm based in New York, NY.

21.     Defendant J.C. Flowers I LP, a Delaware limited partnership, is a private equity fund managed by J.C. Flowers & Co. LLC, and controls Affirmative Insurance Holdings, Inc.

22.     Defendant James Christopher Flowers, an individual, founded J.C. Flowers & Co. LLC, which ultimately formed J.C. Flowers I LP. Flowers at all times relevant was personally involved in the management of J.C. Flowers I LP's interest in AIH.

23.     Defendant Eric Rahe, a resident of New York, served as a member of the AIH Board of Directors during the relevant timeframe, and was also a Managing Director of JCF.

24.     Defendant Thomas C. Davis, a resident of Texas, served as a member of the AIH Board of Directors during the relevant timeframe.

## SUBSTANTIVE ALLEGATIONS

### A.    Related Entities

25.    In 2015, AIH owned AIC, and also a network of other insurance-related entities, including the MGA Businesses.

26.    In 2015, New Affirmative LLC was the majority shareholder of AIH.

27.    New Affirmative LLC was, in turn, wholly-owned by Affirmative Investment, LLC.

28.    The managing member of Affirmative Investment, LLC was Affirmative Associates, LLC.

29.    The sole member of Affirmative Associates, LLC was J. Christopher Flowers.

30.    The majority owner of Affirmative Investment, LLC, was J.C. Flowers I, L.P.

31.    J.C. Flowers & Co., LLC is controlled by J. Christopher Flowers.

32.    J.C. Flowers & Co., LLC is the investment advisor to J.C. Flowers I, L.P.

33.    J.C. Flowers I, L.P. is the majority owner of Affirmative Investment, LLC.

34.    Affirmative Associates LLC was therefore controlled by Flowers.

35.    AIH was therefore controlled by Flowers.

36.    Flowers also controlled JCF AFFM Debt Holdings Ltd., a Delaware limited liability company that was also a significant lender to AIH, as the administrative agent and collateral agent.

### B.    Financial Troubles at AIC

37.    In 2014, the AIH Directors and Officers knew that AIC was experiencing financial difficulties. In addition to the knowledge of AIC's finances that necessarily followed from their leadership roles at AIH, the AIH Directors and Officers were aware that, on

September 30, 2014, the IDOI conducted a test on AIC's finances, determining that AIC's RBC Ratio fell below acceptable levels.

38.    Insurance company RBC Ratios are regularly monitored by state insurance regulatory agencies in order to protect the general public from the risk that irresponsibly-managed insurance companies bankrupt themselves, leaving policyholders without protection.

39.    An insurance company's RBC Ratio is intended to provide regulators with a picture of the company's solvency, and its ability to pay claims to policyholders. As an insurance company's RBC Ratio falls lower, state regulators are empowered (and under certain circumstances legally mandated) to take increasingly drastic regulatory steps, including: requiring the insurance company to submit a business plan to rebuild capital; issuing orders; placing the insurance company under direct regulatory supervision; and forcing liquidation of the insurance company.

40.    A number of factors can change an insurance company's RBC Ratio, including its actuarial methodology, the risk profile of its investments, and its reinsurance agreements.

41.    In particular, changes in the actuarial methodology can have a drastic impact on RBC Ratio. AIH and its lenders were aware that there are many ways to "engineer" RBC to, at least temporarily, achieve the desired result.

42.    An RBC Ratio of less than 200% can trigger regulatory intervention, and ultimately lead to liquidation of the insurance company. Importantly, an RBC Ratio of 200% is a bare minimum to avoid regulatory intervention, and is not a target number for a healthy insurer.

43.     The AIH Directors and Officers were aware that AIC's RBC Ratio was an ongoing problem, and used "creative" actuarial techniques to engineer the RBC Ratio to appear higher than it actually was, prior to the close of the MGA Deal.

44.     One key method to affect an insurance company's RBC Ratio involves the use of reinsurance treaties to transfer risk from the insurance company to a reinsurer, thus putting less of the company's capital at risk.

45.     However, at a May 29, 2014 AIH Board Meeting, the AIH Chief Executive Officer ("CEO") reported to the Board that IDOI determined that AIC's reinsurance treaties did not actually transfer sufficient risk to the reinsurance companies. In other words, IDOI determined that the reinsurance treaties AIC relied upon to shore up its RBC Ratio were not valid for that purpose.

46.     After the September 30, 2014 RBC test, AIH debtholders, including Flowers, became nervous that the company was no longer viable.

47.     In 2014 alone, nearly $30 million was infused into AIC by Flowers and his affiliates in order to maintain its RBC Ratio, evidencing AIC's ongoing financial difficulties. Flowers was painfully aware that he was throwing in good money after bad.

48.     At this time, AIH debtholders, including the JCF Parties, were aware that AIH would not be able to make meaningful loan payments to its debtholders unless the AIC RBC Ratio was maintained, as state regulators would not allow investors to raid funds from a failing insurance company.

49.     After the September 30, 2014 RBC test, the AIH Directors and Officers were aware that IDOI was closely monitoring AIC in order to ensure improvement in the RBC Ratio. IDOI communicated this to the AIH CFO, who shared the information with the AIH

CEO and the AIH Chief Operations Officer ("COO"). None of this information ever was shared with Confie prior to the close of the MGA Deal; in fact, it was affirmatively withheld from diligence.

50.    In December of 2014, Affirmative Agencies was formed as a Texas corporation, with a number of AIH directors or officers acting as directors. These AIH directors or officers acted as the directors of Affirmative Agencies until it was purchased by Confie.

51.    The purpose of Affirmative Agencies was to receive the assets of the MGA Businesses, so that the eventual buyer could enter into the MGA Deal as a stock purchase.

52.    By early 2015, AIC's RBC Ratio problems were serious enough that AIH retained an investment banking advisor to explore various strategies designed to increase said Ratios. AIH's CEO, COO, CFO, and Vice President/Secretary discussed this issue and agreed to keep it out of Form 10-K disclosures for the purpose of keeping the information from potential buyers.

53.    Form 10-K is an annual report, required by the U.S. Securities and Exchange Commission, which is meant to provide disclosures regarding a company's financial performance to investors.

54.    The AIH Directors' and Officers' intentional omission of information from the 10-K for the purpose of hiding information from investors is clear proof that they intended to keep material information from Confie.

55.    By March 26, 2015, the AIH Board of Directors and JCF were aware that AIH would risk state receivership if it could not find a buyer for its MGA businesses.

56.     To this end, at a March 26, 2015 meeting, the AIH Board of Directors authorized the exploration of the sale of the MGA businesses. At that meeting, the AIH CEO told the Board of Directors that IDOI would require a $20 million cash infusion to AIC in order to permit the sale of the MGA businesses.

57.     At the March 26, 2015 meeting, the AIH Vice President and Secretary notified the Board of Directors that the AIH senior and subordinated lenders (i.e. JCF and its affiliates) would need to approve any proposed MGA sale, and would need to waive compliance with covenants in their loan agreements regarding AIC's RBC Ratio.

58.     By the end of March 2015, the AIH Directors and Officers were aware that any deal involving the sale the MGA businesses required the continued financial health of AIC, and that Confie could sue if AIC was not adequately supported by AIH.

59.     The AIH Directors and Officers were also cognizant that through the terms of the MGA Deal being discussed with Confie, AIH was representing that AIC would remain in operation and write insurance for the MGA Business through at least December 31, 2019.

60.     During this period, AIH was in consistent contact with IDOI.

61.     By the end of March 2015, the AIH Directors and Officers were aware that IDOI was threatening to put AIC into receivership.

62.     By May of 2015, IDOI communicated its expectations regarding the proposed MGA Deal with Confie that:

      a.  the MGA Deal needed to close by June 30, 2015;

      b.  a new reinsurance agreement to be effective on June 30, 2015 must have no risk limiting features;

    c.  beginning June 30, 2015, AIC would book at or above the midpoint of the Appointed Actuary's range;

    d.  net premium to surplus ratio would be limited to 3 to 1 beginning with the June 30, 2015 quarterly statement.

63.    The AIH Directors and Officers did not share IDOI's requirements with Confie because they had disastrous implications for AIC's financial health moving forward:

    a.  The fact that the MGA Deal needed to close by June 30, 2015 made clear that AIH was under severe time constraint, and could not afford to (and therefore did not) disclose any information that might jeopardize the transaction before the MGA Businesses could be offloaded to Confie.

    b.  IDOI's insistence that the new reinsurance agreement must have no risk limiting features demonstrates that AIC had been using reinsurance agreements to artificially bolster its RBC Ratio while not actually transferring risk to reinsurers.

    c.  IDOI's requirement that AIC book at or above the midpoint of the Appointed Actuary's range would effectively require AIC to use more funds to bolster reserves rather than make investments, further harming its viability as a business.

    d.  IDOI's requirement that net premium to surplus ratio would be limited to 3 to 1 further limited AIC's profitability by restricting its ability to take in premiums.

64.    Given that IDOI retains wide discretion to regulate the financial health of insurance companies, which are in turn strictly regulated, the AIH Directors and Officers

understood that AIC's ability to continue writing insurance policies would be threatened if it did not comply with IDOI's expectations regarding the MGA Deal. Still, the AIH Directors and Officers chose to withhold information regarding IDOI's investigation from Confie during the diligence period, and continued to represent that AIC would remain viable through December 31, 2019.

65.     These IDOI expectations were later communicated to the AIH Board by the AIH COO in a meeting on June 4, 2015.

66.     During the negotiation of the MGA Deal with Confie, internally, the AIH CEO stated that he could live with an RBC Ratio of 150 percent, and that it could easily be argued that such RBC Ratio would not approach 200% even with a $20 million infusion of Confie capital from the MGA Deal.

67.     In May of 2015, the AIH CEO, the AIH CFO, and a board member circulated pro forma RBC Ratio numbers showing an RBC Ratio at a maximum of 115%.

68.     As the MGA Deal advanced, on May 29, 2015, the AIH Board of Directors gathered to review the term sheet of the proposed MGA Deal with Confie. There, the AIH Vice President/Secretary advised the Board as to the extent of its fiduciary duties to Confie with respect to the proposed MGA Deal. Therefore, the JCF Parties and the AIH Directors and Officers were acutely aware of their duties to their counterparty, Confie.

69.     At this point the AIH Board of Directors was shocked to be in discussions for an $85 to $95 million-dollar deal. At least one member of the AIH Board of Directors was of the opinion, in November of 2014, that AIH should have been liquidated, and was now embarrassed to find that AIH had found a buyer in the form of Confie willing to pay an enormous amount of money for the MGA Businesses.

70.     On May 29, 2015, an employee informed the AIH CEO and the AIH Vice President/Secretary that, depending on how new financial data turned out, there was a strong possibility that AIC would not survive the MGA Deal. This information was never shared with, and was affirmatively concealed from, Confie.

71.     By May 30, 2015, the AIH CEO and the AIH Vice President/Secretary were privately discussing the possibility of state-imposed receivership of AIC, and the probability that AIC would be unable to meet an RBC Ratio of 200%, even with a $20 million cash infusion from the MGA Deal. This information was not disclosed to Confie, and was affirmatively withheld.

72.     At the end of May of 2015, and the beginning of June of 2015, the AIH CEO was in close contact with Rahe (and through Rahe, Flowers) regarding the use of the MGA Deal proceeds. In particular, the AIH CEO reported on the payments the subordinate debtholders could expect from AIH.

73.     On June 2, 2015, AIC entered into a voluntary order with the Wisconsin Department of Insurance, agreeing that it would not write new business in Wisconsin.

74.     On June 4, 2015, a Special Committee of the Board of Directors of AIH (the "Special Committee") was formed with the sole objective of ensuring that as much of the proceeds of the MGA Deal as possible would be turned over to the subordinated lenders (i.e. Flowers).

75.     At the time of the Special Committee meeting of June 4, 2015, its members included a number of the AIH Directors and Officers, including Davis and the AIH CEO. Also in attendance were AIH's COO and its Vice President/Secretary.

76. At the Special Committee meeting of June 4, 2015, advice was given to the attendees regarding their fiduciary duties to creditors in the context of the transaction. In other words, the number one concern of the Special Committee was that the debtholders be paid, regardless of the consequences to the ongoing viability of AIC and/or AIH.

77. At the Special Committee meeting of June 4, 2015, the attendees were also given advice regarding the Board's duties relating to the use of the transaction proceeds to satisfy AIH obligations. Defendants clearly intended to push the limits of their duties in order to ensure Flowers was paid. It was clear that the sole goal of the Board was to move Confie's money to Flowers, despite the fact that the entire deal was premised on the misrepresentation that $20 million would be sufficient to ensure AIC's continued operation.

78. At the Special Committee meeting of June 4, 2015, an AIH Board Member spoke on behalf of Rahe, delivering the message that the MGA Deal could not move forward without Flowers' consent (because Flowers controlled several votes of the Board of Directors), and that the alternative was AIH bankruptcy. This Board Member was able to speak for Rahe because the two conducted a telephone call during a recess of the meeting.

79. At a June 10, 2015 Board of Directors meeting, Davis communicated to the Board the contents of his conversations with Flowers and Rahe, noting Flowers' request that the Board thoroughly consider the rights of the subordinated lenders in the MGA Deal, and Flowers' assertion that the Board's fiduciary duty flowed to Flowers. No discussion was had with respect to AIC's duties to Confie or how those duties interacted with an alleged duty to Flowers. The focus was how the AIH Board could funnel Confie's purchase money to Flowers, rather than on how to use the money to prevent an AIH bankruptcy or AIC's

receivership. Needless to say, there was no discussion of how this scheme would affect Confie's interests in AIC's continued operation.

## C.    Terms of the MGA Deal

80.    On June 12, 2015, Confie and AIH signed the SAPA, which closed on June 30, 2015, wherein Confie purchased the assets of Affirmative Insurance Services, Inc. and Affirmative General Agency for roughly $60 million, plus a total of $25 million to be paid should certain financial thresholds be reached. (Ex. A at § 1.03).

81.    As a part of the SAPA, Confie agreed to pay AIC the amount necessary such that the RBC Ratio of AIC equaled 200%. (Ex. A at § 1.06(a)(ii)).

82.    Specifically, the SAPA stated:

(a) *Closing Payments*. At the Closing, Buyer shall pay, or cause to be paid, the Estimated Cash Payment as follows:

***

(ii) <u>second</u>, **an amount equal to Twenty Million Dollars ($20,000,000) (or such other amount necessary to increase Affirmative Insurance Company's RBC Ratio to 200%** on a pro forma basis as of June 30, 2015, as certified by the Chief Financial Officer of Holdings) to an account of Affirmative Insurance Company;

(Ex. A at § 1.06) (emphasis added).

83.    As a part of the SAPA, AIH represented:

There is no Litigation pending or, to the Sellers' Knowledge, threatened against any Seller or any of their Subsidiaries, which would reasonably be expected to prevent the performance of this Agreement or any other Transaction Document or the consummation of any of the transactions contemplated hereby and thereby, declare unlawful the transactions contemplated hereby and thereby, or cause such transactions to be rescinded.

(Ex. A at § 4.06(b)).

84.    As a part of the SAPA, AIH represented:

Absence of Certain Developments. Except as contemplated or permitted by this Agreement, since the date of the Year-End Financial Statements, there has not occurred any change or event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect on any MGA Entity or the MGA Business, and the MGA Entities have engaged in the MGA Business in all material respects in the Ordinary Course of Business. Since the date of the Year-End Financial Statements, no MGA Entity or, with respect to engaging in the MGA Business, Holdings or any of its other Subsidiaries:

*** 

(n) has settled or compromised, or agreed to settle or compromise, any material Litigation, whether administrative, civil or criminal, in law or in equity, or before any Governmental Authority, in each case which either requires payment in excess of $250,000 for any individual proceeding or which imposes any material non-economic sanctions or obligations prospectively against any such entity;

(Ex. A at § 4.08).

85.     As a part of the SAPA, AIH represented:

Litigation. There is no Litigation pending or, to the Sellers' Knowledge, threatened against (i) any MGA Entity or (ii) Holdings or any of its other Subsidiaries which, in the case of this clause (ii), if adversely determined would reasonably be expected to have a material effect on the MGA Business. **No MGA Entity is subject to any material outstanding Order, and neither Holdings nor any of its other Subsidiaries is subject to any material outstanding Order that relates specifically to any MGA Entity or engaging in the MGA Business.**

(Ex. A at § 4.09) (emphasis supplied).

86.     As a part of the SAPA, AIH represented:

Compliance with Laws. Each MGA Entity and, with respect to engaging in the MGA Business, each of Holdings and its other Subsidiaries, has complied with all insurance Laws, all wage and hour and other material labor Laws, and all other material applicable Laws. Since January 1, 2013, **no MGA Entity or, with respect to engaging in the MGA Business, Holdings or any of its other Subsidiaries has received notice of any action, suit, proceeding, hearing, audit, inquiry, investigation, charge, complaint, claim, or demand that has been filed or commenced against it alleging any failure to so comply.**

(Ex. A at § 4.12) (emphasis supplied).

87. As a part of the SAPA, AIH represented:

Fair Consideration; No Fraudulent Conveyance. The sale of Equity Interests and the MGA Assets pursuant to the terms and conditions of this Agreement (a) represent fair and reasonable terms and conditions, including the amount of the consideration payable by Buyer hereunder and (b) constitute the highest and best offer reasonably obtainable by the Sellers. The Purchase Price (including, without limitation, the Cash Payment) and other consideration provided by Buyer hereunder constitute reasonably equivalent value and fair consideration for the sale of the Equity Interests and the MGA Assets. Each Seller is currently Solvent and will continue to be Solvent both immediately prior to and following the Closing and, will not be rendered insolvent by the sale, transfer and assignment of the Equity Interests and the MGA Assets pursuant to the terms of this Agreement. None of the Sellers is entering into this Agreement or any of the other agreements referenced in this Agreement with the intent to defraud, delay or hinder any of their respective present or future creditors, and the consummation of the transactions contemplated by this Agreement and the other Transaction Documents will not have any such effect. The transactions contemplated in this Agreement or any of the other Transaction Documents will not constitute a fraudulent conveyance or otherwise give rise to any right of any creditor of any Seller to any of the Equity Interests or the MGA Assets after the Closing. For purposes of this Agreement, "Solvent" means that, as of the applicable date of determination, each Seller (i) is able to pay its debts as they become due; (ii) owns property which has a fair saleable value greater than the sum of all its debts (including a reasonable estimate of the amount of all contingent liabilities); and (iii) has adequate capital to carry on its businesses.

(Ex. A at § 4.30) (original emphasis omitted).

88. As a part of the SAPA, AIH represented:

No Adverse Litigation. **No Litigation by or before any Governmental Authority shall be pending or threatened wherein an unfavorable judgment, decree or order would reasonably be expected to prevent the performance of this Agreement or any other Transaction Document** or the consummation of any of the transactions contemplated hereby and thereby, declare unlawful the transactions contemplated hereby and thereby, cause such transactions to be rescinded, materially and adversely affect the right of Buyer to own, operate or control the Company or any of the personal property or assets used in the operation of the MGA Business as currently conducted, or materially and adversely affect the right of Buyer to own, operate or control any of the MGA Assets. Without limiting the foregoing, **neither Holdings nor any of its Subsidiaries shall be subject to a petition for receivership by any insurance**

**regulatory authority, nor shall Holdings or any of its Subsidiaries have Knowledge that any Governmental Authority intends to place any such Person into receivership.**

(Ex. A at § 7.03) (emphasis supplied).

89.     On June 20, 2015, AIH's CEO and AIH's Vice President/Secretary discussed, in writing, the possibility that regulatory intervention would prevent AIC from continuing to write insurance, and the possibility that Confie might sue. AIH's Vice President/Secretary concluded that Confie's only recourse after the MGA Deal would likely be as a general unsecured creditor in bankruptcy. Importantly this discussion occurred **before** the June 30, 2015 RBC Certification. Defendants thus knew that both the RBC Certification and the Sellers' Closing Certificate (attached hereto as Exhibit C, re-affirming, among other things, AIH's solvency post-Closing) would be wrong even before they signed it. Their only concern was whether they could abuse the bankruptcy laws of the United States to avoid responsibility.

90.     On June 23, Rahe and Davis communicated. Rahe conveyed a threat from Flowers to block the closing of the MGA Deal unless he could realize more value in the transaction. Even as it was clear to him that AIC would fail, Flowers' sole concern was extracting additional money from Confie via AIH.

91.     In late June of 2015, the AIH CEO was informed that internal "pro-forma" forecasts showed a projected RBC Ratio of 185% on June 30, 2015. These forecasts, showing that the RBC Ratio would, even with a $20 million infusion of Confie's cash and demonstrably false "pro-forma" assumption, be sub-200% post-closing, were not shared with Confie.

92.     In late June of 2015, AIH's CEO and Vice President/Secretary were already discussing that the deal was a disaster, and that all parties would likely require bankruptcy counsel.

93.     On June 29, 2015, IDOI issued a Corrective Order to AIC ordering it to improve its RBC Ratio to at least 200%, and outlining steps to be taken to that end.

94.     On June 30, 2015, as a condition to closing, the AIH CFO, with implicit AIH Board of Directors approval, provided Confie with a Certificate of RBC Ratio, knowing that it was false. It stated, in part:

> [AIH CFO] hereby certifies, solely in his capacity as Chief Financial Officer of the Company, and not in his personal capacity, that upon payment by Buyer of Twenty Million Dollars ($20,000,000) to Affirmative Insurance Company ("AIC"), **AIC's RBC Ratio will be equal to or greater than 200% on a pro forma basis as of June 30, 2015.**

(Ex. B).

95.     On June 30, 2015, as a condition to closing, the AIH CEO provided a Sellers Closing Certificate, stating, in part:

> The representations and warranties of the Sellers set forth in Article IV of the Purchase Agreement (in each case, without giving effect to any materiality, Material Adverse Effect or similar qualifications contained in such representations and warranties) were in all respects true and correct as of the date of the Purchase Agreement and are in all respects true and correct as of the Closing Date as if made on the Closing Date (except for those representations and warranties that address matters only as of a particular date which shall be true and correct as of such date), except where the failure of such representations and warranties in the aggregate to be true and correct has not and would not reasonably be expected to have a Material Adverse Effect on the MGA Business.

(Ex. C at ¶ 1).

96.     The Sellers Closing Certificate continued to state:

> No litigation by or before any Governmental Authority is pending or threatened wherein an unfavorable judgment, decree or order would

reasonably be expected to prevent the performance of the Purchase Agreement or any other Transaction Document or the consummation of any of the transactions contemplated thereby, cause such transactions to be rescinded, materially and adversely affect the right of the Buyer to own, operate, or control any of the MGA Assets. Without limiting the foregoing, neither **Holdings nor any of its Subsidiaries is subject to a petition for receivership by any insurance regulatory authority, nor does Holdings or any of its Subsidiaries have Knowledge that any Governmental Authority intends to place any such Person into receivership.**

(Ex. C at ¶ 3).

97.     On August 19, 2015, IDOI communicated with the AIH CEO to express concerns that Confie would sue AIH for negotiating in bad faith with knowledge of adverse developments with the company.

**D.     Regulatory Intervention**

98.     At the close of July of 2015, it became clear to Confie what the JCF Parties and AIH Directors and Officers knew prior to closing, but withheld from Confie: despite the $20 million infusion of Confie's cash, AIC did **not** have an RBC Ratio above 200% at the time of the closing, and AIC had no hope of materially increasing its RBC Ratio in the near future.

99.     After the closing of the SAPA, AIH paid the subordinate debtholder, a company owned by Flowers, approximately $10 million, despite AIC's receivership and liquidation.

100.     Initially unbeknownst to Confie, almost immediately after the closing of the MGA deal, IDOI ordered a new reserve analysis on AIC.

101.     In September of 2015, AIC entered into negotiations with IDOI to stave off liquidation. The state of the company rapidly deteriorated after that point.

102.     On September 16, 2015, IDOI filed a Verified Complaint for Rehabilitation before the Chancery Division of the Circuit Court of Cook County, Illinois, thus initiating the

matter styled *People* ex rel. *Dowling v. Affirmative Insurance Company*, 2015 CH 13718. (Verified Complaint for Rehabilitation attached hereto as Exhibit D). That same day, the court entered an Agreed Order of Rehabilitation allowing IDOI to assume control of AIC. (Agreed Order of Rehabilitation attached hereto as Exhibit E).

103.    On September 17, 2015, IDOI demanded that AIC immediately cease writing new insurance.

104.    IDOI lifted this demand only in exchange for a commitment letter from Confie promising to infuse an additional $15 million into AIC, on September 21, 2015.

105.    In fulfillment of the commitment letter, Confie transferred an additional $15 million to AIC on or around September 29, 2015.

106.    On October 15, 2015, AIH filed for Chapter 11 bankruptcy in Delaware, in contravention of § 4.30 of the SAPA and Sellers' Closing Certificate.

107.     On March 24, 2016, IDOI sought from the court, and received, an Order of Liquidation with Finding of Insolvency. (Order attached hereto as Exhibit F).

108.    Due to AIC's receivership and subsequent liquidation, Confie has been forced to enter into last-minute agreements with other insurers in order to ensure that AIC policyholders continue to be insured.

109.    Because of the emergency nature of these transactions, Confie was forced to accept extremely high costs and unfavorable terms, depriving them of the benefit of the bargain.

110.    The value of the MGA Deal to Confie was the ability to continue the MGA Businesses operations, which were entirely dependent on AIC as a market. Instead, Confie was forced to convince different insurers to write already-risky nonstandard auto policies on

an emergency basis. Confie overpaid the insurers by millions of dollars as a result, because the insurers knew that Confie had no choice but to continue ensuring coverage for the MGA Businesses' policyholders.

111.     The MGA Businesses, and therefore Confie, were also deprived of the business of policyholders who ceased purchasing insurance through the MGA Businesses as a result of AIC's receivership and subsequent liquidation.

112.     After the closing of the MGA Deal, Flowers and/or other entities controlled by Flowers received at least one multimillion dollar payment from AIH.

## CAUSES OF ACTION

### COUNT I
### Violation of § 10(b) of the Exchange Act and Rule 10b–5 Promulgated Thereunder
### (Against Director Defendants)

113.     Plaintiff repeats and realleges paragraphs one (1) through one hundred and twelve (112) of this Complaint as if fully restated herein.

114.     The AIH Directors and Officers, including the Director Defendants, disseminated or approved the false statements specified above, which they knew or deliberately disregarded as misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.     The AIH Directors and Officers, including the Director Defendants, violated § 10(b) of the Exchange Act and Rule 10b–5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts,

practices, and a course of business which operated as a fraud and deceit upon Confie, the purchaser of the AIH-owned MGA Businesses.

116. The AIH Directors and Officers, including the Director Defendants, knowingly misrepresented the financial health of both AIC and AIH to Confie, and misled Confie by concealing the high likelihood of imminent state regulatory intervention of AIC and insolvency of AIH.

117. The AIH CFO signed the RBC Certification of June 30, 2015 representing that AIC's RBC Ratio was over 200%, knowing that it was false at the time.

118. In the alternative, the AIH CFO signed the RBC Certification June 30, 2015 without having inquired as to the RBC Ratio of AIC, therefore acting with extreme recklessness in making representations as to the RBC Ratio of AIC.

119. The AIH CEO signed the Sellers' Closing Certificate on June 30, 2015 affirming that the representations and warranties made by AIH at, among others, §§ 4.06(b), 4.09, 4.12, 4.30 and 7.03, were in all respects true and correct as of the Closing date of the MGA Deal, knowing however that the affirmation was false.

120. In the alternative, the AIH CEO signed the Sellers' Closing Certificate on June 30, 2015 without having inquired as to the veracity of §§ 4.06(b), 4.09, 4.12, 4.30 and 7.03, therefore acting with extreme recklessness in making such affirmation to Confie.

121. The AIH Directors and Officers, including the Director Defendants, were made aware of AIC's extreme financial difficulties, both through email correspondence and AIH Board of Directors meetings, yet knowingly permitted the transaction to continue under fraudulent pretenses.

122.    The AIH Directors and Officers, including the Director Defendants, were aware that the AIH CFO had signed the RBC Certification, and had knowledge that the representations contained therein were materially false and/or misleading.

123.    The AIH Directors and Officers, including the Director Defendants, were aware that by June 30, 2015, AIC was subject to multiple state regulatory orders, even though the SAPA represented that no such orders were in place.

124.    The AIH Directors and Officers, including the Director Defendants, were aware that by June 30, 2015, AIH was on the verge of insolvency, even though AIH represented to the contrary in the SAPA.

125.    Confie has suffered damages, in that it would have not entered into the MGA Deal under the terms agreed-to, had it known Defendants' statements were false and misleading.

## COUNT II
### Violation of § 20(a) of the Exchange Act
### (Against the JCF Parties)

126.    Plaintiff repeats and realleges paragraphs one (1) through one hundred and twenty-five (125) of this Complaint as if fully restated herein.

127.    Flowers acted as a controlling person of AIH within the meaning of Section 20(a) of the Exchange Act as alleged herein.

128.    By virtue of his controlling interest in AIH via JCF and JCF I, Flowers possessed the general ability to exercise control over AIH.

129.    By virtue of the debts AIH owed to Flowers and/or entities controlled by or affiliated with Flowers (including JCF AFFM Debt Holdings Ltd.), Flowers possessed the general ability to exercise control over AIH.

130.    The JCF Parties exercised control over AIH through the ability to select a number of AIH Board of Directors members.

131.    The JCF Parties exercised control over AIH by selecting at least one JCF employee to be a member of the AIH Board of Directors.

132.    Flowers exercised control over the transaction known as the MGA Deal by using his controlling interest in AIH, and the debts owed to him and his affiliates by AIH, to exert influence over the AIH Board of Directors and AIH Officers to ensure his loans to AIH would be repaid.

133.    Had Flowers and the JCF Parties not consented to the MGA Deal, AIH would not have been able to enter into the MGA Deal, which required the consent of the AIH subordinated debtholders.

**COUNT III**
**Common Law Fraud**
**(Against the Director Defendants)**

134.    Plaintiff repeats and realleges paragraphs one (1) through one hundred and twelve (112) of this Complaint as if fully restated herein.

135.    The AIH Directors and Officers, including the Director Defendants, knowingly made false and/or misleading statements of material fact to Confie by:

    a.    Falsely representing that AIC's RBC Ratio was above 200% as of June 30, 2015;

    b.    Falsely representing that AIC was not subject to any material Order;

    c.    Falsely representing that AIC had not received notice of any outstanding investigations;

    d.   Failing to inform Confie that IDOI was likely to order AIC into rehabilitation.

    e.   Failing to inform Confie that AIC had entered into a voluntary order with the WDOI that prohibited AIC from writing any new business in the State of Wisconsin.

    f.   Falsely representing that AIH was and would remain solvent (for at least 24 months) following the Closing of the SAPA.

136.    The AIH Directors and Officers, including the Director Defendants, made the aforementioned false and/or misleading statements of fact with the intention of inducing Confie to enter into the MGA Deal.

137.    Confie reasonably relied upon the AIH Directors and Officers, including the Director Defendants', false and/or misleading statements of material fact.

138.    Confie has suffered damages in that it would have not entered into the MGA Deal under the terms agreed-to had it known AIH Directors and Officers, including the Director Defendants', statements were false and misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

139.    Awarding compensatory and punitive damages in favor of Plaintiff for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

140.    Awarding Plaintiff its costs and expenses in this litigation, including reasonable attorneys' fees and exerts' fees and other costs and disbursements; and

141.    Awarding Plaintiff such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: July 12, 2017

Respectfully Submitted,

MICHELMAN & ROBINSON, LLP

*/s/   Michael C. Kasdin*
    One of Plaintiff's Attorneys

Michael C. Kasdin (ARDC # 6283200)
Seth E. Darmsdadter (ARDC # 6284759)
Matthew R. Lasky (ARDC # 6318140)
mkasdin@mrllp.com
sdarmstadter@mrllp.com
mlasky@mrllp.com
200 South Wacker Drive, Suite 2900
Chicago, IL  60606-5896
Tel:  (312) 638-5671
Fax: (312) 638-5672

*Attorneys for Plaintiff*